**STATE of Tennessee, Appellee,**

v.

**Edward Thomas KENDRICKS, III, alias Edward Thomas Kendrick, III, Appellant.**

Court of Criminal Appeals of Tennessee, at Knoxville.

Sept. 25, 1996.

Permission to Appeal Denied by Supreme Court May 5, 1997.

Jerry H. Summers, Chattanooga (on Appeal), Ardena Garth, Public Defender, Hiram G. Hill, Asst. Public Defender, Chattanooga (at Trial), for Appellant.

Charles W. Burson, Attorney General and Reporter, Hunt S. Brown, Asst. Attorney General, Nashville, William H. Cox, III, District Attorney General, C. Leland Davis, Dee Anne Irwin, Asst. District Attorneys General, Chattanooga, for Appellee.

## OPINION

PEAY, Judge.

The defendant was indicted for and convicted by a jury of first-degree murder. He was sentenced to life imprisonment. He now appeals as of right raising the following issues:

1. The evidence was insufficient to support his conviction;

2. The trial court erred when it found a child witness to have been properly qualified to testify;

3. The trial court erred when it limited the defendant's attempt to introduce prior statements of a witness;

4. The trial court erred when it allowed the prosecution to cross-examine the defendant about prior convictions;

5. The trial court erred when it allowed the State to produce a witness whose identity had not been disclosed to the defendant;

6. The trial court erred when it allowed hearsay testimony under the excited utterance exception;

7. The state violated *Brady v. Maryland* when it failed to disclose exculpatory information to the defendant;

8. The trial court erred when it did not give a limiting instruction on the use of an "excited utterance;" and

9. The trial court erred when it included an instruction on flight in its charge to the jury.

Because we find no merit in the defendant's grounds for this appeal, we affirm the judgment below.

On March 6, 1994, at approximately 10:00 p.m., the defendant drove to the gas station at which Lisa Kendrick, his wife and the victim, worked. With him in the car were their four-year-old daughter and three-year-old son. These children were sitting in car seats in the back seat of the station wagon the defendant was driving. Also in the car, on the front passenger floorboard, was the defendant's loaded 30.06 hunting rifle.

The defendant pulled into the station, parked, and went into the market portion of the station where his wife worked as a cashier. He asked her to come outside, which she did. She and the defendant went to the car where she spoke briefly to the children. The defendant retrieved the rifle from the front passenger floorboard and carried it to the back of the car. At that point, the weapon fired once, the bullet striking the victim in her chest and killing her almost instantly.

After the victim fell to the parking lot, the defendant briefly bent over her body, put the gun back in the car, and drove toward the airport a short distance away. On the way, he threw the rifle out of the car. Once he arrived at the airport, he called 911 and reported that he had shot his wife. Before the defendant left the gas station, he took no action to assist the victim in any way.

Timothy Shurd Benton, a customer, was in the market when the defendant entered. He testified that the defendant had asked the cashier "to step outside, he had something to show her." Benton left the market, got in his car and started to leave the parking lot. He testified that, as he had begun to leave, he heard an "explosion." He looked over his shoulder out the window of his car and saw the defendant holding a rifle "pointed straight up in the air." He also saw the victim lying on her back on the parking lot. After deciding that another person in the market was aware of the situation and would call for help, Benton followed the defendant to the airport, where he contacted an airport police officer.

Lennell Shepheard was also in the market at the time the defendant entered. He testified that he had seen the defendant and his wife leave the store, that the defendant had not appeared angry or hostile, and that the victim had shown no signs of fear when she went outside at the defendant's request. Shepheard remained in the store until he heard the rifle shot. At that point, he opened the market door and looked outside to see what had happened. He testified that he had seen the defendant shut the back passenger door and then lean over the victim's body and state, "I told you so" approximately six times.

Endia Kendrick, the defendant's four-year-old daughter, testified on direct examination that she had seen her father shoot her mother and that her mother had had her arms up at the time. However, on cross-examination, Endia admitted that she hadn't actually seen the shooting.

Dr. Frank King, the Hamilton County Medical Examiner, testified that the victim had died of a single gunshot wound to the chest that entered her body in the left chest at forty-nine inches above the heel and exited her body at the left back at forty-nine and one-half inches above the heel.

The defendant testified that he had been moving the rifle from the front of the car to the back at the request of the victim and that it had discharged accidentally. He testified that he had been shifting it from one hand to the other when it went off. He testified that he had not pulled the trigger. He steadfastly denied that he had intended to shoot the victim, and claimed that he had been carrying the rifle in the car because he sometimes cleaned apartments near an area where he felt a gun was necessary for personal protection. He also denied making any statements as he bent over the victim, and testified that he had taken no action to assist her because he knew she was dead. The defendant also testified that he and the victim had agreed on an irreconcilable differences divorce, that an attempted reconciliation had recently failed, and that he suspected that she had had or was having an affair. He denied that he was upset or angry at his wife about the status of their relationship.

In support of his contention that the rifle fired accidentally, the defendant relied on the testimony of Officer Steve W. Miller. Officer Miller testified that he had shot himself in the foot with the rifle when he was removing it from the trunk of his car after recovering it from where the defendant had thrown it. Officer Miller testified that he had shot himself accidentally. He further testified that he could not recall whether or not his finger had been on the trigger of the gun when it fired.

Kelly Fite, a firearms examiner, testified that he had examined and tested the rifle and that, in his opinion, "[t]he only way that you can fire this rifle without breaking it is by pulling the trigger."

After the defense closed its proof, the State called Martha Kay Maston as a "rebuttal" witness. Maston testified that she had been working as a public safety officer for the Chattanooga Metropolitan Airport Police on the night of the shooting. On finding the defendant at the airport, she saw the two children in the back seat of the car. She testified that she had gotten the children out and that they were both "very upset and hysterical." She further testified that "when I got [the little girl] out of the car, she just put her arms around me and she stated that she had told daddy not to shoot mommy but he did and she fell." Maston testified that the defendant's daughter had not made any other statements and that his son had not said anything.

The defendant first challenges the sufficiency of the proof, arguing that it is not sufficient to support a conviction of first-degree murder. In conjunction with this argument, the defendant asserts that the trial court erred first, when it did not direct a verdict of acquittal, and second, when it did not set aside the conviction under its duty as thirteenth juror. We disagree with the defendant in this regard and find the evidence sufficient to support the conviction.

When an accused challenges the sufficiency of the convicting evidence, we must review the evidence in the light most favorable to the prosecution in determining whether "*any* rational trier of fact could have

found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). We do not reweigh or re-evaluate the evidence and are required to afford the State the strongest legitimate view of the proof contained in the record as well as all reasonable and legitimate inferences which may be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978).

■ Questions concerning the credibility of witnesses, the weight and value to be given to the evidence, as well as factual issues raised by the evidence are resolved by the trier of fact, not this Court. *Cabbage,* 571 S.W.2d 832, 835. A guilty verdict rendered by the jury and approved by the trial judge accredits the testimony of the witnesses for the State, and a presumption of guilt replaces the presumption of innocence. *State v. Grace,* 493 S.W.2d 474, 476 (Tenn. 1973). It is the defendant's burden to illustrate to this Court that the evidence preponderates against the guilty verdict in favor of his or her innocence. *Id.*

To support a conviction of first-degree murder, the State must have proven beyond a reasonable doubt that the killing was "intentional, premeditated and deliberate." T.C.A. § 39–13–202 (1991 Repl.). A person kills intentionally "when it is the person's conscious objective or desire to engage in the [killing] conduct or [to] cause the [death]." T.C.A. § 39–11–302 (1991 Repl.).

■ The State argues that the defendant's intent to kill the victim is proved by the defendant's actions in bringing the gun to the station, calmly requesting his wife to come outside, repeatedly stating "I told you so" while standing over her body, and failing to render any assistance following the shooting. The State also points out that the defendant and the victim had been in the midst of divorce proceedings and that the defendant had suspected his wife of having an affair. While the defendant denied that he had been angry at his wife, denied that he had brought the gun to the station with the intent of shooting her with it, and denied that he had said "I told you so" to her as she lay on the parking lot, the jury chose not to believe the defendant's version of the facts. This, the

jury had the right to do. Giving the State the strongest legitimate view of this evidence, as we must, these facts are sufficient to prove the element of intent.

■ The elements of premeditation and deliberation require that the State prove beyond a reasonable doubt that the defendant had thought about committing the homicide for some period of time before killing the victim and that this thought process was engaged in while the defendant was in a " 'cool mental state, under such circumstances, and for such a period of time as to permit a "careful weighing" of the proposed decision.' " *State v. Brown,* 836 S.W.2d 530, 541 (Tenn.1992) (quoting with approval C. Torcia, *Wharton's Criminal Law* § 140 (14th ed. 1979)).

■ In support of these elements, the State again points to the fact that the defendant drove to the gas station with the loaded rifle in his car, asked the victim to come outside "in a calm fashion so as not to scare her away or draw attention to his true purpose," shot her in spite of his daughter's plea, and then left the scene without taking any steps to assist her. Obviously, all of this evidence is circumstantial as to the defendant's state of mind. However, Tennessee courts have long recognized that first-degree murder may be proved through circumstantial evidence. *State v. Brown,* 836 S.W.2d at 541. The defendant's driving around all day with a loaded gun in his car, the calm with which he approached his wife at her place of employment, and the fact that he requested her to leave her work station and come outside, certainly give rise to the inference that the defendant had thought about killing his wife and that he had done so while in a "cool" state of mind. The jury rejected the defendant's explanation of these circumstances. The defendant's contention that the evidence was insufficient to prove intent, premeditation and deliberation is without merit.

For the foregoing reasons, the trial court did not err when it refused to direct a verdict of acquittal and when it refused to set aside the verdict in its capacity as thirteenth juror.

■ The defendant next complains that the trial court erred when it found the defendant's daughter, four-year-old Endia Kendrick, qualified to testify. When the State was attempting to qualify this witness, it first demonstrated the child's knowledge of the difference between the truth and a lie. To the subsequent question, "Is it a good thing to tell a lie?" she answered, "No." However, when the State then asked, "What happens if you tell a lie?" she answered, "I don't know." The defendant argues that the trial court should have disqualified this witness based on this response.

However, following this response the State asked, "What do you think would happen if you did tell a lie?" and the child answered, "You get a whipping." She also answered in the affirmative when the State asked if she was "going to tell us the truth here today?" Over the defendant's objection, the trial court found the child qualified to testify "with some trepidation."

■ Under Tennessee Rule of Evidence 601, "Every person is presumed competent to be a witness except as otherwise provided in these rules or by statute." There is no general exception based on age. However, "[b]efore testifying, every witness shall be required to declare that the witness will testify truthfully by oath or affirmation." Tenn. R.Evid. 603. Thus, before she could testify, the trial court must have determined that Endia understood the concept of the "truth" and that she would testify "truthfully." Our standard of review of the trial court's decision in this regard is abuse of discretion. *State v. Hallock*, 875 S.W.2d 285, 293 (Tenn. Crim.App.1993). Here, the trial court did not abuse its discretion in finding Endia competent to testify. This issue is without merit.

■ The defendant next complains about the trial court's refusal to allow him to introduce extrinsic evidence of a prior inconsistent statement made by Officer Miller about how he shot himself in the foot with the defendant's rifle. On direct examination by the State, Officer Miller testified that he had "no recollection of how the weapon discharged." On further direct examination, he testified as follows:

Q. Do you have a memory of where exactly your hand was or where exactly your fingers were precisely on the weapon?

A. No, sir.

Q. Okay. Do you have a memory as to whether or not your finger was on the trigger or not on the trigger?

A. No, sir.

On cross-examination, the officer recalled making a statement while in the hospital in conjunction with the preparation of an "EOF." According to Officer Miller, an EOF is an internal report generated when a police officer is injured while on duty. However, on being presented with copies of the incident report and supplemental report prepared, apparently, by Officers Michael Holbrook and Glen Sims, respectively, Officer Miller testified that he did not recall making the statements that had been recorded. Defense counsel then attempted to introduce the statements through Officer Sims, to which the State objected. The trial court sustained the objection.

In an offer of proof, defense counsel read into the record from one of the reports:

The victim, Inspector Steve Miller, states he was removing a 30–06 caliber from the trunk of his police car. He states that he picked the gun up with both hands and that his finger was not near the trigger, as he lifted the weapon out, the rifle went off.... The round struck him in the left foot. Also Mr. Miller said that he was handling the rifle with care because it was to be [finger]printed.... He said that he was taking the rifle out by its stock when it fired.

In essence, then, Officer Miller repeatedly testified at trial that he couldn't remember where his fingers were on the gun when it fired. His prior statement that defense counsel attempted to introduce through Officer Sims was, in essence, that his fingers were not near the trigger when it fired.

Extrinsic evidence of prior inconsistent statements is admissible if the witness "is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon[.]" Tenn.R.Evid. 613(b). Here, de-

fense counsel offered Officer Miller the opportunity to explain or deny his prior statements to Officer Sims, and Officer Miller responded that he didn't remember making the statements. The State was also given an opportunity to conduct further examination of Officer Miller. Therefore, the only issue is whether the prior statement was "inconsistent" with Officer Miller's trial testimony.

Our rules of evidence do not define "inconsistent." However, this Court has previously ruled that "[i]f the witness denies or does not recall making the statement, then it can be used to impeach the witness' testimony." *State v. Tyrone Montgomery*, No. 999, 1987 WL 9536, Hamilton County (Ct.Crim.App. filed April 16, 1987, at Knoxville). Tenn. R.Evid. 613 does not change this holding. *See, e.g., State v. Ricky Thompson*, No. 03C01–9406–CR–00198, 1996 WL 30252, McMinn County (Ct.Crim.App. filed January 24, 1996, at Knoxville) (where witness neither admitted nor denied alleged prior statement, but rather stated that he "might have. I do not remember," trial court erred in precluding evidence of prior statement). Therefore, we think that Officer Sims' testimony about Officer Miller's prior statement should have been admitted, but we also find the trial court's error in excluding this testimony to have been harmless error.[1] The jury had before it a thorough cross-examination of Officer Miller, including the following exchanges:

Q. When you picked up the gun and you showed the jury how you turned, you had your hand just like that?

A. Right.

Q. You didn't put your finger on the trigger, do you?

A. No, sir.

. . . .

Q. Well, in 22 years as a police officer, have you ever discharged a gun before accidentally into your foot?

A. No, sir.

Q. Okay. Or in any other part of your body?

A. No, sir.

. . . .

Q. Have you ever had a gun accidentally discharge as you—at the crime scene or anything else?

A. No, sir.

Q. Okay. How many times a day is it drilled into you at the police academy don't ever put your hand on the trigger unless you're going to shoot the gun, that's pretty standard, isn't it?

A. Yes, sir.

Q. Would you ever put your finger on the trigger of a gun you're lifting out of your car, especially when, as you say, you knew the gun was loaded?

A. Not knowingly, no.

. . . .

Q. Well, you told them that you never had your finger on the trigger, you didn't shoot the gun, did you not tell them that?

A. I didn't intentionally shoot the gun, no.

Q. Okay. And you know not to put your finger on the trigger of a loaded gun unless you want to shoot it, don't you?

A. That's correct.

Q. And you've practiced that rule for the past 22 years, have you not?

A. Yes.

This testimony provided the jury ample evidence from which it could have concluded that Officer Miller's memory was faulty and that he knew he had not caused the gun to fire by pulling the trigger. The exclusion of Officer Sims' testimony was therefore harmless. This issue is without merit.

 In his next issue, the defendant complains that the trial court erred when it allowed the prosecution to cross-examine him about prior convictions. On direct examination, the defendant's lawyer asked him, "do you have any history of any convictions for any kind of crime?" The defendant responded, "Returned checks." A short colloquy

---

1. We note that Officer Sims' testimony would have been admissible under Tenn.R.Evid. 613 only to impeach Officer Miller's testimony, and that the trial court would have been required to instruct the jury to consider this testimony only for impeachment purposes and not as substantive evidence. *See State v. Reece,* 637 S.W.2d 858, 861 (Tenn.1982).

about the bad check convictions followed; no mention was made on direct about any other convictions.

On cross-examination, the State inquired about an additional conviction for drunk driving, which the defendant admitted. In conjunction with this questioning, the defendant also admitted to a conviction for possession of marijuana. This questioning occurred after vigorous objection from defense counsel which the trial court overruled. The defendant now contends that the trial court erred in allowing the State to introduce this evidence of the defendant's misdemeanor convictions.

We disagree. The State was not introducing this proof as a means of showing character. Nor was it trying to impeach the defendant's credibility by showing that he had previously engaged in crimes of dishonesty. Rather, the State was impeaching the defendant's testimony on direct as being less than forthright. This is proper. "Irrespective of admissibility under Rule 609 [of Tennessee Rules of Evidence], a conviction may be used to contradict a witness who 'opens the door' and testifies on direct examination that he or she has never been convicted of a crime, or to counter some other facet of direct testimony." Cohen, Sheppeard & Paine, *Tennessee Law of Evidence* § 609.1 (3d ed. 1995). Here, the defendant "opened the door" when he testified about only some of his prior convictions in response to a question on direct examination about "any" convictions for "any" type of crime. The defendant's less than candid response left the clear impression that the bad check convictions comprised the total of his prior convictions. This issue is without merit.

In his next issue, the defendant contends that the trial court erred in allowing undisclosed witness Martha Maston, the airport police public safety officer, to testify. The defendant filed a pretrial motion requesting a list of the State's witnesses, and Maston's name was not provided. Moreover, the defendant argues, her name was not included in the indictment as required by statute. The prosecuting attorneys contended at trial that they had not become aware of the substance of this witness' testimony until during the

trial, and that they notified defense counsel as soon as they determined that she should be called as a witness.

■■■■ The State is directed to list "the names of such witnesses as [it] intends shall be summoned in the cause" on the charging indictment. T.C.A. § 40–17–106 (1990 Repl.). The purpose of this statute is to prevent surprise to the defendant at trial and to permit the defendant to prepare his or her defense to the State's proof. However, this duty is merely directory, not mandatory. *State v. Harris,* 839 S.W.2d 54, 69 (Tenn. 1992). The State's failure to include a witness' name on the indictment will not automatically disqualify the witness from testifying. *Id.* A defendant will be entitled to relief for nondisclosure only if he or she can demonstrate prejudice, bad faith, or undue advantage. *Id.* The determination of whether to allow the witness to testify is left to the sound discretion of the trial judge. *State v. Underwood,* 669 S.W.2d 700, 703 (Tenn.Crim.App.1984).

■■■■ The defendant concedes that Maston's testimony "was devastating proof which was highly prejudicial to the defense." From the record, however, what appears to have been devastating was the substance of Maston's testimony, not the fact that her identity was not disclosed to the defendant until after he had closed his case. "In this context, it is not the prejudice which resulted from the witness' testimony but the prejudice which resulted from the defendant's lack of notice which is relevant to establish prejudice." *State v. Jesse Eugene Harris,* No. 88–188–III, 1989 WL 60393, Davidson County (Tenn.Crim.App. filed June 7, 1989, at Nashville). The defendant here has simply failed to show how he was prejudiced by the late notice of Maston's identity. His trial counsel ably cross-examined Maston. The defendant has failed to show what more he could or would have done had he known about Maston earlier.

Nor has the defendant demonstrated bad faith or undue advantage on the State's part. Rather, it appears that the State was somewhat less than diligent in following up on all of its investigatory leads. Officer Rawlston

knew about Maston and her encounter with Endia within a week of the incident, and apparently failed to bring it to the prosecuting attorneys' attention. We do not think that this rises to the level of bad faith. Nor do we think that the State deliberately withheld Maston's identity in an effort to gain undue advantage. Rather, we suspect that the assistant district attorneys would have liked to have known about Maston's testimony far sooner than they did. We see no abuse of discretion by the trial judge in ruling Maston qualified to testify.

 In conjunction with this argument, the defendant also complains that the trial court erred by allowing Maston to be called as a rebuttal witness. We agree with the defendant that Maston's testimony should have been introduced during the State's case in chief. The State's argument that her testimony was used for the purpose of rebutting the defendant's attack on Endia's credibility is disingenuous. The point of producing Maston to testify was to get before the jury Endia's statement, "I told daddy not to shoot mommy but he did and she fell." This statement is helpful to the State's case because it goes to the defendant's state of mind at the time of the shooting, not because it bolsters Endia's prior testimony that she had seen her father shoot her mother.

Nevertheless,

> the determination of the admissibility of rebuttal evidence lies in the discretion of the trial court. This court will not interfere with the exercise of this discretion unless there has been clear abuse of discretion appearing on the face of the record.

> Indeed, we have observed that it is within the discretion of the trial court to permit the state, in a criminal case, to introduce in rebuttal even testimony which *should* have been introduced in chief. Clearly, in the instant case, the better practice would have been to introduce [the rebuttal witness'] testimony during the state's case in chief, when the issue of [the state's witness'] credibility was first raised by defense counsel [on cross examination].

*State v. Cyrus Deville Wilson*, No. 01C01–9408–CR–00266, 1995 WL 676398, Davidson County (Tenn.Crim.App. filed November 15, 1995, at Nashville) (emphasis in original) (citations omitted). In *Wilson*, we affirmed the trial court's decision to allow the rebuttal witness to testify, finding no error. Here, we find ourselves constrained to do the same. We simply fail to see how the defendant was prejudiced by the order in which Maston's testimony was produced.

 The defendant also attacks Maston's testimony on the grounds that it contained hearsay that should not have been admitted under the excited utterance exception. The excited utterance hearsay exception provides for the admissibility of "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tenn.R.Evid. 803(2). The statement about which the defendant complains is, of course, the statement of his daughter testified to by Maston.

The defendant contends that his daughter was not still sufficiently under the "stress of excitement caused by the event or condition" at the time that Maston recovered her from the car. We find this argument untenable. The child's mother had just been killed within a few feet of where she was sitting. The stress of this particular "excitement" can properly be expected to continue for a significant time. This issue is without merit.

 Related to this issue is the defendant's complaint that the trial court erred when it did not give a limiting instruction with respect to Maston's testimony about Endia's statement. Apparently, the defendant is arguing that, since the State contended that Maston was a rebuttal witness, evidence introduced through her should have been limited in its use to issues of credibility. The trial court did not give such a limiting instruction either contemporaneously with Maston's testimony or in its charge to the jury.

As set forth above, regardless of the State's arguments at trial as to why this evidence was properly considered "rebuttal," Maston's testimony should have been tendered as part of the State's case in chief. As

such, Endia's statement was properly considered as substantive evidence of the defendant's state of mind at the time he shot his wife. No limiting instruction was therefore necessary. Furthermore, the defendant waived his right to raise this issue because he failed to request any limiting instruction at trial, did not object to its omission, and did not include this specific ground in his motion for new trial. *State v. West*, 844 S.W.2d 144, 151 (Tenn.1992). This issue is without merit.

■ As to the defendant's contention that the trial court erred when it allowed Maston to repeat Endia's statement on redirect, we find this issue also without merit. After Maston had already testified about Endia's statement on direct, the State asked on redirect, "What did [Endia] tell you?" The defendant did not object. Accordingly, the defendant waived any objection to the witness' answer to the question. *State v. Hopper*, 695 S.W.2d 530, 536 (Tenn.Crim.App.1985).

■ We also find without merit the defendant's contention that Maston's testimony contained a component of exculpatory information and that the State violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), when it failed to inform him about Endia's statement before trial. Specifically, the defendant argues that Endia's statement to Maston is exculpatory because it includes no mention of having seen her mother's arms in a raised position at the time of the shooting. We disagree that an hysterical four-year-old's silence to a complete stranger on the exact position in which her mother was standing at the time she was shot is "exculpatory."

■ Moreover, before the State has any duty to disclose exculpatory evidence to the defendant under *Brady*, the evidence must be material in the sense that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). Clearly, Endia's silence to Maston on the position of her mother's arms does not meet this test.

■ Finally, the defendant argues that the trial court erred when it gave the jury an instruction on flight. We disagree. There is no dispute that the defendant left the scene of the shooting immediately after it occurred. It is the *purpose* for which he left that is at issue. The State points to the defendant's actions in throwing the gun out of the window of his car as he drove away as support for its argument that the defendant was attempting to evade arrest or prosecution. However, the defendant testified that he had left the scene out of concern for his two very young children and that he tossed the gun because he was "scared."

With respect to the issue of flight, the trial court charged the jury as follows:

Flight is the voluntary withdrawal of oneself *for the purpose of evading arrest or prosecution for the crime charged.*

The flight of a person accused of crime is a circumstance which, when considered together with all the facts in the case, may justify an inference of guilt. It is a circumstance which may tend in some degree to prove a consciousness of guilt, and is entitled to more or less weight according to the circumstances of the particular case. The law makes no nice or refined distinction as to the manner or method of a flight. It may be open or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However, it takes both a leaving of the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight.

If flight is proved, it is not sufficient in itself to establish the guilt of the defendant. However, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight, if so proven, together with all of the other evidence when you decide the guilt or innocence of the defendant. On the other hand, an entirely innocent person may take flight and such flight may be explained by proof offered, or by the facts and circumstances of the case.

Whether the evidence presented proves beyond a reasonable doubt that the defen-

dant fled, the reasons for it, and the weight to be given it, are questions for you to determine.

(Emphasis added). This instruction is in substantial accord with our pattern jury instruction, T.P.I.—Crim. 42.18, which has been cited with approval by our Court. *See State v. Payton,* 782 S.W.2d 490 (Tenn.Crim. App.1989); *State v. Whittenmeir,* 725 S.W.2d 686, 688 (Tenn.Crim.App.1986).

We think that the defendant's actions in fleeing the scene and subsequently throwing the gun out of his car window are sufficient evidence of attempting to evade prosecution as to render the instruction proper. The jury had before it the defendant's explanation of his actions and was not bound to find that his departure equaled guilt. Nor, however, would it have been error for the jury to have inferred the defendant's guilt from his flight when combined with the other facts and circumstances of this case. This issue is therefore without merit.

The defendant's contentions being without merit, the judgment below is affirmed.

SMITH, J., and JOHN K. BYERS, Senior Judge, concur.